## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| TOWN OF SHARON, MASSACHUSETTS, <br><br> Plaintiffs , <br><br> v. <br><br> 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); AGC CHEMICALS AMERICAS INC.; AMEREX CORP.; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DUPONT DE NEMOURS AND COMPANY; KIDDE-FENWAL, INC.; KIDDE PLC, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; UNITED TECHNOLOGIES CORPORATION; TYCO FIRE PRODUCTS LP; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; <br><br> Defendants. | MDL No.: 2873 <br><br> Master Docket No.: 2:18-mn-2873 <br><br> JUDGE RICHARD GERGEL <br><br> Civil Case No.: 2:22-cv-3458-RMG <br><br> DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |

## PLAINTIFF'S COMPLAINT

Plaintiff, Town of Sharon, Massachusetts (hereinafter "Plaintiffs" or "Sharon" or "The Town"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), AGC Chemicals Americas, Inc., Amerex Corp., Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, ChemDesign Products, Inc., Chemguard, Inc., Chemicals

Incorporated, The Chemours Company, The Chemours Company FC, LLC, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours, Inc., Dynax Corporation, E. I. DuPont De Nemours and Company, Kidde-Fenwal, Inc., Kidde PLC, Inc., Nation Ford Chemical Company, National Foam, Inc., United Technologies Corporation), Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), and UTC Fire & Security Americas Corporation, Inc., and alleges as follows:

## SUMMARY OF THE CASE

1.    Plaintiffs brings this action against Defendants to recover (i) any and all past and future compensatory and/or consequential damages for the investigation, remediation, removal, disposal, treatment, and monitoring of the ongoing contamination of its surface water, groundwater, drinking water systems, soil, and sediment caused and/or created by Defendants' Aqueous Film Forming Foam (AFFF) products,  (ii) attorneys' fees and costs, (iii) as well as any and all other damages available as a result of the actions and/or inactions of Defendants.

2.    The Town of Sharon is responsible for supplying drinking water to individuals and businesses in Sharon.  The Town owns, operates, and maintains a water system which includes six groundwater wells.

3.    The Town of Sharon seeks to recover the substantial past and future costs necessary to remediate and prevent AFFF contamination of its drinking water supply.

4.    Plaintiff brings this action to address the presence of Polyfluoroalkyl substances or "PFAS" chemicals in the Town's public water supply system due to Defendants.  Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

2

5.     Since the 1960's through present, Defendants designed, manufactured, marketed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or AFFF containing PFOA, PFOS and/or their chemical precursors (collectively, "PFAS Products").  While 3M was the original manufacturer of the fluorochemical-based AFFF, other manufacturers later used telomer-based fluorochemical surfactants in their AFFF.

6.     AFFF has been used regularly in training exercises as well as live fire emergency scenarios to suppress and extinguish Class B fuel fires since the 1960's at military bases, airports, fire stations, industrial plants, refineries, and fire training centers, as well as for various live fire emergency scenarios.

7.     This action arises from the discharge, disposal, and failure to contain or address AFFF contaminants utilized at fire-fighting facilities located in the Town of Sharon resulting in the ongoing and persistent contamination of public and private drinking water with PFAS that presents an imminent and substantial endangerment to human health and the environment.

8.     This action arises from the negligent, intentional, and/or illegal acts and/or omissions of Defendants leading to the contamination of the Town's drinking water supply with PFAS chemicals from AFFF.

9.     Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), were found at elevated levels in the drinking water system of the Town of Sharon.

10.     Upon information and belief, the use of AFFF within the Town of Sharon and the surrounding areas has contaminated the drinking water aquifers and resulted in the necessary closure of two of the Town's six drinking water wells due to elevated PFAS concentrations.

11.     The Town of Sharon had to install a temporary water treatment process for a drinking water well contaminated with PFAS at levels in excess of Massachusetts drinking water standards. Another well was closed for being near the Massachusetts limit for PFAS in drinking water. Most wells are contaminated in excess of the Environmental Protection Agency's recently updated Interim PFOA and PFOS Health Advisories.

12.     The Town of Sharon's Fire Department, the Norwood Memorial Airport, and other potential sources of AFFF overlies aquifers which supply 98% of the businesses and residents in the Town of Sharon with drinking water.   These aquifers are susceptible to surface contamination due to a lack of hydrogeologic barriers such as a confining layer of clay.

13.     Defendants designed, manufactured, marketed, distributed, and/or sold PFAS containing AFFF with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and as intended by the Defendants.  Defendants also possessed knowledge that these chemicals would persist in the environment and would not degrade, posing a threat to public health indefinitely.

14.     PFAS Products are known as "forever chemicals" because PFOS and PFOA are extremely persistent in the environment and resistant to typical environmental degradation processes primarily because the chemical bond between the carbon and fluorine atoms is extremely strong and stable.

15.     Upon information and belief, at all times pertinent herein, Defendants' PFAS Products have been released, used, stored, and/or disposed of in the Town of Sharon for fire protection, training, and response activities resulting in the contamination of the Town's drinking water aquifers. Upon information and belief, during these activities, Defendants' PFAS Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which

allowed PFOS, PFOA, and/or their chemical precursors to enter the environment, and migrate through the soil, sediment, surface water, and groundwater of the Town of Sharon, thereby contaminating Plaintiff's water supply.

16.     Defendants were also aware that in general their PFAS containing AFFF products were being used in a manner not intended, namely that customers often used AFFF to clean equipment and vehicles.  Defendants knew of this unsuitable usage, but failed to warn customers of the grave environmental consequences of off label use.

17.     At all times pertinent herein, Plaintiff did not know, nor should it have known, of the ongoing contamination of the Town's drinking water resources through the use, release, storage, and/or disposal of Defendant's PFAS containing Products.

18.     Defendants knew, or should have known, that PFAS and related constituents in Defendants' products and by-products present unreasonable risks to human health, water quality, and the environment and of the dangers associated with these compounds. Yet, Defendants handled, discharged, and were otherwise responsible for the release of PFAS into the environment without sufficient containment, caution, warning, testing, or alternative feasible products or components. Upon information and belief, Defendants' acts and omissions resulted in the presence of PFAS in the Town's drinking water system.

19.     As a result of the occurrence of PFAS in the environment from Defendants' products, Plaintiff has incurred costs to install a temporary PFAS treatment system, will be required to fund and implement considerable additional capital costs, and will in the future incur ongoing operation and maintenance costs, in order to remove and treat for the presence of PFAS in the public water supply.

20.     Plaintiffs request an order requiring Defendants pay for the investigation, delineation, remediation, and disposal of all PFAS contamination in the Town's water supply, as well as pay for the cost of temporary treatment systems or an alternative water supply until the full remediation of the Town's drinking water aquifers is complete.

## PARTIES

21.     Plaintiff, Town of Sharon, is a local government of the Commonwealth of Massachusetts with its primary place of business being 90 South Main Street, Sharon, MA 02067.

22.     Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiff has standing to bring all claims pled herein.

23.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the PFAS Products/Components that have and continue to contaminate the groundwater, surface water, sediment, and soil of the Town of Sharon:

> a.  Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in Massachusetts, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M is the only company that manufactured and/or sold AFFF containing PFAS in the United States, including Massachusetts.

> b.  Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC America is registered to do business in Massachusetts.

c.  Defendant, Amerex Corp. ("Amerex"), is an Alabama corporation organized and existing under the laws of Alabama and does business throughout the United States, including conducting business in Massachusetts.  Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, AL 35173.

d.  Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied PFAS Products for use in AFFF. Archroma U.S., Inc. is registered to do business in Massachusetts.

e.  Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in Massachusetts. Upon information and belief, Arkema, Inc. is the operating U.S. subsidiary of Arkema France, SA.

f.  Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF is registered to do business in Massachusetts. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including Massachusetts.

g.  Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina

28086. Buckeye does and/or has done business throughout the United States, including in the Commonwealth of Massachusetts.

h.  Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier.

i.  Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, this Defendant manufactured PFAS Products for use in AFFF sold throughout the United States, including in Massachusetts.

j.  Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard is registered to do business in the Commonwealth of Massachusetts.

k.  Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, this Defendant manufactured PFAS Products for use in AFFF sold throughout the United States, including in Massachusetts.

l.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours is registered to do business in the Commonwealth of Massachusetts.

    i.  In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information

and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFASs and the products that contain PFASs.

m.  Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in the Commonwealth of Massachusetts.

n.  Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

o.  Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is registered to do business in Massachusetts.

p.  Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off

companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Massachusetts.

q.  Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, this Defendant manufactured PFAS Products for use in AFFF sold throughout the United States, including in Massachusetts.

r.  Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont").

s.  Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

t.  Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. DuPont is registered to do business in the Commonwealth of Massachusetts.

u. Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Upon information and belief, Kidde was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. (collectively, "Kidde/Kidde Fire"). Upon information and belief, Kidde/Kidde Fire does and/or has done business throughout the United States, including in the Commonwealth of Massachusetts.

v. Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in the Commonwealth of Massachusetts.

w. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, this Defendant manufactured PFAS Products for use in AFFF sold throughout the United States, including in Massachusetts.

x. Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam manufactures the Angus brand of

AFFF products. National Foam does and/or has done business throughout the United States, including in the Commonwealth of Massachusetts.

y.  Defendant United Technologies Corporation is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, United Technologies Corporation does and/or has done business in Massachusetts.

z.  Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011. Tyco is a subsidiary of Johnson Controls International, plc, an Irish public limited company.

   i.  Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in the Commonwealth of Massachusetts.

aa. Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in Massachusetts.

24.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

25.    When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

27.    This Court has personal jurisdiction over the Defendants as Defendants have engaged in regular, systematic, and substantial economic activities in the Commonwealth of Massachusetts. These continuous activities, including marketing, selling, and/or distributing AFFF, are connected to the Plaintiff's claims as alleged herein.

28.    Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3"). Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the District of Massachusetts. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the District of Massachusetts as the "Home Venue" as this case may have originally been filed there.

29.    Venue is proper in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a governmental

entity and a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## **FACTUAL ALLEGATIONS**

### **1. AQUEOUS FILM FORMING FOAM - AFFF**

30. The first firefighting foam was developed in 1902 by Russian engineer and chemist Aleksandr Loran. Loran was working in the oil and gas industry trying to find a substance to combat petroleum-based fires for which water is ineffective. Loran's solution was the first firefighting foam which was able to extinguish oil and other flammable liquids-based fires by blanketing and smothering them.

31. Through the years, multiple developments were made in the firefighting foam sector. Beginning in the 1960's, the Naval Research Laboratory (NRL) in cooperation with the 3M Company began conducting research into the use of synthetic chemical compounds containing fluorine and carbon atoms, namely Perfluoroalkyl and polyfluoroalkyl substances (PFAS), for use in firefighting foams as a more effective means of suppressing hydrocarbon fuel-based fires.

32. PFAS are a group of manufactured chemicals used to make fluoropolymer coatings and products that resist heat, oil, stains, grease, and water, that have been used in industry and consumer products. Processes to commercially produce PFAS were first developed in the 1940s. In the 1950's, 3M started manufacturing the two most well-known and well-studied types of PFAS, namely Perfluorooctanoic acid (PFOA - used to make Teflon) and Perfluorooctanesulfonic acid (PFOS - the main component of Scotch Guard). PFOA and PFOS became popular for product applications because the fluoropolymer coatings allowed for the repelling of water, protecting of surfaces and resisting of heat, amongst other desirable properties.

33.     As such, the NRL in the 1950's and 1960's started utilizing 3M's PFOA, also known as C8, and PFOS to develop its Aqueous Film-Forming Foam (AFFF).  Many PFAS, including PFOA and PFOS, are a concern because these substances do not break down in the environment, can move through soils and contaminate drinking water sources, and build up (bioaccumulate) in crops and wildlife.

34.     PFAS containing AFFF was typically sprayed directly onto a petroleum-based fire, where it works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

35.     By the late 1960's, the U.S. Navy required all of its vessels to carry AFFF.  In the 1970's the Department of Defense began using AFFF to fight fuel fires at all military installations.   By the late 1970's, the Navy-developed AFFF fire suppressant was not only in heavy use by the military, but was also used at more than 90 airports in the U.S. as well as in many civilian fire departments.

36.     AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.   However, the AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

37.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

38.     All other Defendants manufactured PFASs for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

39.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment. PFAS do not exist in nature and are entirely man-made substances.

40.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

## 2.   The Contaminants: PFOA & PFOS

41.     PFOS and PFOA are the most widely studied of the PFAS chemicals because they are the two PFAS that have been produced in the largest amounts within the United States.   PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as per- and polyfluoroalkyl substances ("PFAS").

42.     PFOS and PFOA are extremely persistent in the environment and resistant to typical environmental degradation processes primarily because the chemical bond between the carbon and fluorine atoms is extremely strong and stable.  PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. This bond is one of the strongest chemical bonds in nature and the resulting persistence has earned these synthetic substances the nickname "forever chemicals".

43.     PFOA and PFOS are soluble and readily transportable via air and water.  PFOA and PFOS will leach from the surface into groundwater where PFOA and PFOS are chemically stable and resist degradation

44.     The use of Defendants' PFAS Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter into and onto the Town of Sharon resources

where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to the Town.

45.    Due to these 'forever chemicals' persistent nature, among other things, these substances have, and continue to cause injury and damage to the Town of Sharon resources and property.

### 3.  PFOA & PFOS HEALTH EFFECTS

46.    The majority of research on the potential human health risks of PFAS are associated with oral (ingestion) exposure. Limited data exist on health effects associated with inhalation or dermal exposure to PFAS. Most available toxicity data are based on laboratory animal studies. There are also several human epidemiological studies of PFOA and PFOS. Exposure to some PFAS above certain levels may increase risk of adverse health effects.

47.    The available epidemiological and animal studies[1] suggest links between PFAS exposure and several negative health outcomes including:

a.  Hepatic Effects (increased cholesterol, increased liver weight; hypertrophy);

b.  Cardiovascular Effects (pregnancy-induced hypertension and pre-eclampsia)'

c.  Endocrine Effects (thyroid disease);

d.  Immune Effects (decreased vaccine response);

e.  Respiratory Effects (asthma, COPD, bronchitis);

f.  Reproductive Effects (decreased fertility);

g.  Skeletal Effects (osteoarthritis);

h.  Developmental Effects (decreased birth weight)

i.  Carcinogenic Effects (kidney, liver, testicular, prostate, non-Hodgkin's lymphoma)

---

[1] See ATSDR "Toxicological Profile for Perfluoroalkyls, Draft for Public Comment" (2018) found online at https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf

48.     Under the EPA's Guidelines for Carcinogen Risk Assessment (USEPA, 2005b), there is "suggestive evidence of carcinogenic potential" for PFOA.[2]

49.     Similarly, the International Agency for Research on Cancer (IARC) classifies PFOA as "possibly carcinogenic to humans".[3] Higher PFOA serum levels may be associated with testicular, kidney, prostate, and ovarian cancers and non-Hodgkin lymphoma.[4]

50.     Increases in prostate, kidney, and testicular cancers have been found in workers or in community members living near a PFOA facility.[5]

51.     Animal studies for PFOA report developmental effects (survival, body weight changes, reduced ossification, delays in eye opening, altered puberty, and retarded mammary gland development), liver toxicity (hypertrophy, necrosis, and effects on the metabolism and deposition of dietary lipids), kidney toxicity (weight), immune effects, and cancer (liver, testicular, and pancreatic).[6] The animal toxicity studies available for PFOA also demonstrate that the developing fetus is particularly sensitive to PFOA-induced toxicity. Human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (liver, testicular, and kidney).

52.     For PFOS, epidemiological studies have reported associations between PFOS exposure and high serum cholesterol and reproductive and developmental parameters.    Exposure to PFOS has

---

[2] EPA, "Guidelines for Carcinogen Risk Assessment" EPA-630-P-03-001F (2005).
[3] International Agency for Research on Cancer (IARC), "Agents Classified by the IARC Monographs, volumes 1-125" (2019); IARC "Monographs on the Identification of Carcinogenic Hazards to Humans" (2019).
[4] Vieria et al., "Perfluorooctanoic Acid Exposure and Cancer Outcomes in a Contaminated Community: A Geographic Analysis" Environ Health Perspect. 121(3): 318–323 (2013).
[5] ATSDR, "Public Health Statement, Perfluoroalkyls" (2015).
[6] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R-16-004 (2016).

caused hepatotoxicity, neurotoxicity, reproductive toxicity, immunotoxicity, thyroid disruption, cardiovascular toxicity, pulmonary toxicity, and renal toxicity in laboratory animals and many in vitro human systems.[7] These results and related epidemiological studies confirmed the human health risks of PFOS, especially for exposure via food and drinking water. Applying the EPA Guidelines for Carcinogen Risk Assessment, there is suggestive evidence of carcinogenic potential for PFOS.[8]  Studies in animals have shown that PFOA and PFOS can cause cancer in the liver, testes, pancreas, and thyroid.

### 4.  PFOA & PFOS ENVIRONMENTAL EFFECTS

53.     Due to the characteristics of these synthetic chemicals, PFOA and PFOS are a significant threat to drinking water supplies in the U.S. The natural breakdown of PFOA and PFOS over time is assumed to be virtually nonexistent.  In addition to a resistance to natural degradation, PFOA/PFOS' highwater solubility causes significant mobility in soil and an affinity to leaching into groundwater.   This problem is particularly magnified with respect to any municipality drawing its drinking water from an aquifer underlying a current or former military base or airport.

54.     Once the "forever chemicals" PFOS and PFOA contaminate a groundwater source, water treatment will be necessary to resolve any threats to public health.  Unfortunately, PFOS and PFOA resist most conventional chemical and microbial treatment technologies. Technologies with demonstrated effectiveness include granular activated carbon sorption and ion exchange resins.[9]

55.     The most common treatment method for PFOA and PFOS contaminated groundwater is extraction and filtration through granular activated carbon. However, because PFOA and PFOS

---

[7] Zeng, et al, "Assessing the human health risks of perfluorooctane sulfonate by in vivo and in vitro studies" Environment International Volume 126, May 2019, Pages 598-610 (2019).
[8] EPA, "Guidelines for Carcinogen Risk Assessment" EPA-630-P-03-001F (2005).
[9] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); EPA, "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)." EPA 822-R-16- 005 (2016).

have moderate absorbability, the design specifics are very important in obtaining acceptable treatment.[10]   Other potential adsorbents include: ion exchange resins, organo-clays, clay minerals and carbon nanotubes.[11] Evaluation of these sorbents needs to consider regeneration, as the cost and effort required may be substantial.   Other *ex situ* treatments including nanofiltration and reverse osmosis units have been shown to remove PFASs from water. Incineration of the concentrated waste would be needed for the complete destruction of PFAS.[12]

56.    The costs of decades of PFAS contamination are enormous to public health, the environment, and to state and federal coffers.   Federal, state and local governments have only just begun to scratch the surface of identifying PFOA/PFOS contamination.   These governmental entities have to budget for environmental investigations, assessments, inspections and monitoring; cleanup, remediation and waste disposal; water filtration and alternative drinking water supplies; health monitoring and biomonitoring; fish sampling; and wastewater and landfill leachate treatment.

### 5. DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF RISKS TO PUBLIC HEALTH AND THE ENVIRONMENT

57.    Not long after introducing these "forever chemicals" into regular use, the military and scientists within the 3M Company began to question the environmental impacts of AFFF.

---

[10] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); EPA, "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)." EPA 822-R-16- 005 (2016).

[11] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); Espana, V.A., Mallavarapu, M., and R. Naidu. "Treatment Technologies for Aqueous Perfluorooctanesulfonate (PFOS) and Perfluorooctanoate (PFOA): A Critical Review with an Emphasis on Field Testing." Environmental Technology & Innovation. Volume 4. Pages 168 to 181. (2015).

[12] Minnesota Department of Health (MDH) "MDH Evaluation of Point-of-Use Water Treatment Devices for Perfluorochemical Removal. Final Report Summary." (2008); Vecitis, C.D., Park, H., Cheng, J., and B.T. Mader "Treatment Technologies for Aqueous Perfluorooctanesulfonate (PFOS) and Perfluorooctanoate (PFOA)." Frontiers of Environmental Science & Engineering in China. Volume 3(2). Pages 129 to 151. (2009).

58.    In 1974, a Navy report asked whether AFFF alternatives ought to be considered for "environmental impact" reasons.

59.    Upon information and belief, in 1975, 3M scientists were made aware that PFAS chemicals were bioaccumulating in the bodies of US citizens across the nation.

60.    In 1976, Navy scientists again proposed exploring alternatives to AFFF, citing environmental concerns.

61.    Studies have found PFOS and PFOA in the blood samples of the general human population and wildlife, indicating that exposure to the chemicals is widespread.[13]

        a.    The wide distribution of PFAS in organisms is strongly suggestive of the potential for bioaccumulation and/or bioconcentration.

62.    In 1978, another Navy report again identified environmental and public health risks posed by AFFF and noted the "difficulties obtaining adequate information" from 3M.[14]  At this point when the US Navy was questioning the health and environmental impacts of AFFF, upon information and belief 3M were finding PFAS chemicals at levels 1,000 times normal in the blood of its workers and in the flesh of fish surrounding its manufacturing plants.

63.    Manufacturers of AFFF observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers. Upon information and belief, despite the fact that 3M concluded that PFOA and PFOS "should be regarded as toxic," 3M determined that the "risks should not be reported at this time."

---

[13]US Department of Health and Human Services - Agency for Toxic Substances and Disease Registry. 2018. "Draft Toxicological Profile for Perfluoroalkyls"; EPA 2015, "Long-Chain Perfluoroalkyl Carboxylate and Perfluoroalkyl Sulfonate Chemical Substances; Significant New Use Rule." Proposed Rule. 40 CFR 721. Federal Register: Volume 80 (No. 13).

[14] Department of the Navy, "Candidate Environmental Impact Statement - Discharging Aqueous Film-Forming Foam (AFFF) to Harbor Waters During Tests of Machinery Space Fire-Fighting Foam Systems Aboard U.S. Navy Ships" (1978).

64.    Upon information and belief, additional animal studies conducted by 3M in 1978 and 1979 further confirmed the public health and environmental risks posed by PFOS and PFOA.

65.    In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.

66.    By the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

67.    By the early 1980's, the Department of Defense began investigating the environmental and health impacts of AFFF through their own animal studies.  A 1981 study conducted by the Air Force found AFFF harmful to female rats and their pups, including low birth weights. Air Force Animal studies by the Air Force and Navy in 1983 and 1985 found that PFAS could damage cell growth.[15]

68.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[16]

69.    Defendants also knew or reasonable should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver,

---

[15] S.M. Salazar, "Toxicity of Aqueous Film-Forming Foams to Marine Organisms: Literature Review and Biological Assessment" Naval Ocean Systems Center (1985).

[16] See Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.[17]

70.    By 1983 3M's medical officer warned in an internal memo "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

71.    In 1991, the Air Force identified firefighting foam as the suspected cause of animal and vegetation deaths near Peterson Air Force Base.

72.    Despite the substantial evidence that AFFF was an environmental and public health threat for decades, it was not until 2000 that the EPA announced that "(f)ollowing negotiations between EPA and 3M, the company...announced that it will voluntarily phase out and find substitutes for PFOS".[18]   Along with the announcement of the phase out of PFOS, it was revealed that a 3M animal study revealed significant health risks associated with PFOS exposure even at low doses. Following the announcement of the phaseout in 2000, the Department of Defense held a meeting at the Naval Research Laboratory to discuss AFFF environmental issues within the Department.[19]

73.    In 2001, a Department of Defense memorandum by Curtis Bowling, the Assistant Deputy Under Secretary of Defense Force Protection, noted that PFOS was "persistent, bioaccumulating, and toxic."   More than a decade later, to prevent future releases to the environment, the DOD finally stopped land-based use of AFFF in training, testing and maintenance through a department wide policy issued in January 2016.  The US Navy announced that it intended to remove, dispose,

---

[17]   *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[18]   EPA News Release, "EPA and 3M ANNOUNCE PHASE OUT OF PFOS" (2000) found at https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html
[19]   See "Minutes of the DOD AFFF Environmental Meeting" held at the Naval Research Laboratory Navy Technology Center for Safety and Survivability Washington, D.C. On 2-3 August 2000.

and replace legacy AFFF containing PFOS and/or PFOA once an environmentally suitable substitute is identified and certified to meet milspec requirements.

74.    In 2017, the Army completed its PFOS/PFOA water sampling at 2,905 Army locations including 380 Army drinking water systems, both inside and outside the United States.  At the same time, the U.S. Air Force completed enterprise-wide sampling of drinking water at all installations — stateside and overseas — to ensure drinking water supplies meet EPA guidelines.

75.    In 2019, the U.S Navy began investigating PFAS contamination by sampling wells around its bases. In the same year, the Department of Defense announced a PFAS Task Force to deal with the rising problem of PFAS contamination at military installations across the country and overseas. The DOD identified 401 active and former installations in the U.S. where there appeared to be some level of PFOS/PFOA from defense activities.  In addition to these installations, as of 2014, there were 664 current or former military fire- or crash-training sites, all of which are likely contaminated with PFAS chemicals.

76.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold PFAS Products, including Teflon nonstick cookware, and more recently PFAS feedstocks for the use in the manufacture of AFFF products.

77.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold PFAS Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Town resources.

78.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the

public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[20]

79.    By July 2011, DuPont's "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link" between PFOA exposure and the conditions of pregnancy-induced hypertension and preeclampsia.   By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

80.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

81.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold PFAS Products; (2) issued instructions on how PFAS Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or PFOS to contaminate the surface water, soil, and groundwater in and around the Town of Sharon; (3) failed to recall and/or warn the users of PFAS Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of PFAS Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFAS Products.

---

[20] *See*, *e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

82.     At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

83.     As a direct result of Defendants' actions and/or inactions alleged in this Complaint, upon information and belief the groundwater, surface waters, soil, and sediment in the Town of Sharon has been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated and aquifers are regularly sampled. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and remediate PFOA and PFOS contamination of its drinking water supply at significant expense, loss, and damage.

84.     Defendants manufactured, designed, transported, and/or sold AFFF that was used in the Town of Sharon.  At various times dating back to the 1960s, AFFF has been stored, used, and/or discharged in the Town of Sharon leading to contamination of Town resources including groundwater.

85.     Defendants had a duty and breached their duty to evaluate and test such PFAS Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by PFAS Products.

86.     Defendants have known for decades that PFAS are toxic and because AFFF contains PFAS, the release of AFFF poses substantial health and environmental risks. Notwithstanding that

knowledge, Defendants persistently and intentionally hid the danger of AFFF from consumers and the public.

87.     Defendants knew, foresaw, and/or reasonably should have known and/or foreseen that PFAS from AFFF would contaminate and harm the Town's public health, safety, welfare, natural resources, and the environment.

88.     Instead of disclosing the dangers associated with PFAS used in AFFF, Defendants went to great lengths to falsely promote AFFF as being safe and appropriate for widespread use.

89.     Defendants repeatedly assured and represented to governmental entities, to consumers, and to the public that AFFF exposures presented no risk of harm and were of no legal, toxicological, or medical significance of any kind.

90.     At all relevant times, Defendants shared and/or should have shared among themselves, all relevant information relating to the presence, bio-persistence, and bioaccumulation of PFAS from AFFF in the environment and in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

91.     At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the Town from discovering the existence and extent of any harm as alleged herein.

92.     At all times pertinent herein, Plaintiff did not know nor should it have known of the ongoing contamination of Town resources through the use of AFFF as Defendants did not disclose

the toxic nature and harmful effects of the AFFF which Defendants designed, manufactured and sold with PFOA and/or PFOS.

93.    Plaintiff filed suit within one year of discovering the claims pled herein.

94.    At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse environmental damage and health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in the environment and human blood.

95.    At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted the Town of Sharon to the environmental, toxicological, medical, or other significant risks from PFAS contamination.

96.    At all relevant times, Defendants encouraged the continued and increased use and release of AFFF, which caused PFAS to be released into the environment of the Town of Sharon by their customers and others, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with AFFF containing PFAS.

97.    Defendants' actions have contaminated and harmed the Town of Sharon's public health, safety, welfare, natural resources and the environment.

### 6.    **Dupont's Fraudulent Transfer Scheme Designed to Avoid Liability**

98.    In approximately 2014, DuPont formed Chemours as a wholly-owned subsidiary. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

99.     In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business included at least titanium technologies, fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemours Company FC, LLC (again, collectively "Chemours").

100.    In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.

101.    The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

102.    At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

103.    At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

104.    Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. This indemnification remains uncapped.

Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

105.    Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

106.    At the time of the DuPont-Chemours spin-off in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

107.    Until the completion of the spinoff, Chemours was a wholly-owned subsidiary of DuPont, and even though Chemours had a separate board, the board was controlled by DuPont. After the spin-off, new members of the Chemours board were appointed. The spin-off and related decisions were conducted while DuPont controlled the board. The new Chemours board did not take part in the separation.

108.    DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds. Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

109.   Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFCs.

110.   In 2016, Chemours itself acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

111.   Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

112.   At the time of the DuPont-Chemours spin-off, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

113.   The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liability, including for the claims that arise out of this case, which has and will further harm Plaintiff.

7. **Regulation of PFAS**

114.    In October of 2020, the Massachusetts Department of Environmental Protection (MassDEP) established a maximum contaminant level ("MCL") for drinking water of 20 part per trillion ("ppt") for the sum of six individual PFAS: (i) Perfluorooctane Sulfonic Acid (PFOS); (ii) Perfluorooctanoic Acid (PFOA); (iii) Perfluorohexane Sulfonic Acid (PFHxS), (iv) Perfluorononanoic Acid (PFNA), (v) Perfluoroheptanoic Acid (PFHpA); and (vi) Perfluorodecanoic Acid (PFDA).

115.    When all or some of the listed compounds (frequently referred to as PFAS6) occur together in drinking water, the detected concentrations for these PFAS summed should be less than 20 ppt or ng/L per Massachusetts MCL.

116.    The USEPA has not published a Federal Maximum Contaminant Level (MCL) for any PFAS.  However, the USEPA has issued health advisories for certain PFAS on three occasions.

117.    The USEPA may publish health advisories for contaminants that are not subject to any national primary drinking water regulation. 42 U.S.C. 300g–1(b)(1)(F)). EPA develops health advisories to provide information on the chemical and physical properties, occurrence and exposure, health effects, quantification of toxicological effects, other regulatory standards, analytical methods, and treatment technology for drinking water contaminants. Health advisories describe concentrations of drinking water contaminants at which adverse health effects are not anticipated to occur over specific exposure durations (e.g., one-day, ten-days, and a lifetime).

118.    In 2009, the USEPA issued Provisional Health Advisories of 400 ppt for PFOA and 200 ppt for PFOS.

119.    In May of 2016, USEPA announced updated Health Advisories for PFOA and PFOS which were both set at 70 ppt.

120.     Most recently, on June 15, 2022, USEPA issued interim updated drinking water health advisories PFOA and PFOS that replace those USEPA issued in 2016. The updated advisory levels, which are based on new science and consider lifetime exposure, indicate that some negative health effects may occur with concentrations of PFOA or PFOS in water that are near zero.

121.     The USEPA interim updated health advisories for PFOA and PFOS are now set at 0.004 ppt and 0.02 ppt, respectively. USEPA released these interim updated health advisories for PFOA and PFOS based on data and draft analyses that indicate that the levels at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS.

### 8.  IMPACTS OF AFFF ON THE TOWN OF SHARON

122.     The Town of Sharon water system currently serves about 17,500 customers or approximately 98% of the Town via six groundwater supply wells including four gravel pack wells (Wells 3, 4, 5, and 6) and two well fields (Wells 2 and 7).

123.     The Town of Sharon relies solely on local groundwater aquifers for its drinking water.

124.     The Town of Sharon's drinking water supply wells are located in an aquifer with a high vulnerability to contamination due to the absence of hydrogeologic barriers (i.e.- clay) that can prevent contaminant migration from the surface and surrounding soils.

125.     Following the promulgation of the Massachusetts MCL ("MMCL") for PFAS6 in October of 2020, the Town of Sharon sampled its drinking water wells for PFAS contamination in April of 2021.  Sampling analysis showed that Well 4 returned results in excess of the MMCL for PFAS6.

126.     Well 4 was immediately shut down after receiving notice that the well was contaminated in excess of the MMCL.  The Town implemented a temporary (one year) resin filter treatment

system to reduce the PFAS6 levels at Well 4. The Town intends to replace this temporary system by installing a permanent filter system solution.

127.    Well 2 returned results near the MMCL for PFAS6 and was also shut down.  To date, no treatment system has been implemented for Well 2 which is still shut-in.

128.    As seen in Figure 1 below, the Sharon Fire Department overlies the aquifer which provides drinking water for the Town and is located less than a mile from both Well 2 and Well 4.



Figure #1

129.    Additionally, as seen in Figure #2, the Norwood Memorial Airport overlies aquifers which communicate with the aquifers which provide drinking water for the Town of Sharon.

## Town of Sharon – Potential AFFF





130.    Additionally, the Town continues to investigate potential sources of contamination to the drinking water supply. Upon information and belief, additional potential sources of contamination to the drinking water supply exist.

131.    The rest of the six drinking water supply wells relied on by the Town of Sharon returned results for the sum of PFAS6 ranging from less than 2 ppt to 8.6 ppt.

132.    Upon information and belief, Sharon's drinking supply wells are contaminated with AFFF in excess of the USEPA interim updated health advisories for PFOA and PFOS.

133.    The Town of Sharon's water supply will require extensive sampling, delineation, and remediation for PFAS contamination.

134.    The injuries to Plaintiff caused by Defendants' conduct constitutes an unreasonable interference with, and damage to the Town of Sharon. Plaintiff's interests in protecting its natural resources constitute a reason for seeking damages sufficient to restore such resources to their pre-contamination condition, in addition to the other damages sought herein.

## FIRST CAUSE OF ACTION:

## STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN

135.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

136.    Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and selling PFAS Products.

137.    Defendants manufactured, marketed and/or sold AFFF or AFFF components containing PFOA and/or PFOS for use in controlling and extinguishing aviation, marine, fuel, and other flammable liquid fuel fires.

138.    Defendants knew or should have known that PFAS are hazardous to the environment and to human health.

139.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFOA and/or PFOS, was hazardous to the environment and human health.

140.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and/or emergency situations in a manner that dangerous chemicals would be released into the environment.

141.    Further, Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be stored at military bases and fire training facilities, and that the storage systems would likely be used and maintained in a manner that dangerous chemicals would be released into the environment.

142.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate soil, surface water, and/or groundwater supplies if released into the environment.

143.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and/or PFOS would result in the contamination of the Town of Sharon resources including drinking water aquifers.

144.    Plaintiff was and continues to be harmed by PFAS containing AFFF Products which were designed, manufactured, marketed, sold and/or distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

145.    Defendants' PFAS containing AFFF Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

146.    Defendants represented, asserted, claimed and/or warranted that their PFAS containing AFFF Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

147.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of PFAS containing AFFF Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

148.    Defendants' PFAS containing AFFF Products marketed, sold, and utilized in the Town of Sharon were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

149.    Defendants knew, or should have known, that use of Defendants' AFFF products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into the surface water, soil, and groundwater.

150.    Furthermore, Defendants knew or should have known that their PFAS containing AFFF Products were toxic, could not be contained, and do not readily degrade in the environment.

151.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFAS, including PFOA and/or PFOS.

152.    Alternative designs and/or formulations of AFFF were already available, practical, and technologically feasible. The use of these alternative designs would have reduced or prevented the

reasonably foreseeable harm to environment that was caused by the Defendants' manufacture, marketing, and sale of AFFF that contained PFOA and/or PFOS.

153.    Defendants' PFAS containing AFFF Products used in the Town of Sharon were defective in design and unreasonably dangerous because, among other things: (a) PFOA and PFOS cause soil and water contamination, even when used in their foreseeable and intended manner; (b) even at extremely low levels, PFOA and PFOS render drinking water unfit for consumption; (c) PFOA and PFOS pose significant threats to public health; and (d) PFOA and PFOS create real and potential threat to the environment.

154.    Plaintiff was, is and will continue to be harmed by Defendants' defectively designed PFAS containing AFFF Products.

155.     As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of the Town of Sharon resources, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, and legal fees.  This includes, but is not limited to remediation of the Town's drinking water supply system and upgrades to the system's facilities.

## SECOND CAUSE OF ACTION:

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

156.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

157.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFOA and/or PFOS, was hazardous to the environment and human health.

158.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS would result in the contamination of the Town of Sharon's resources.

159.    As manufacturers, distributors, suppliers, sellers, and marketers of PFAS containing AFFF Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFOA and/or PFOS being released into the environment.

160.    Defendants knew that their PFAS containing AFFF Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

161.    Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

162.    Defendants failed to provide sufficient warning to the end users and the public of PFAS containing AFFF Products, including Town of Sharon fire and water division officials, that the use and storage of Defendants' product would cause the product to be released into the environment and cause the contamination of the environment, surface water, soil, and/or groundwater, with PFAS, including but not limited to PFOA and/or PFOS.

163.    Adequate instructions and warnings on the PFAS containing AFFF Products could have reduced or avoided these foreseeable risks of harm to the environment and the threat to public health.

164.    Upon information and belief, PFAS containing AFFF Products purchased or otherwise acquired from Defendants were used, discharged, and/or released in the Town of Sharon or

surrounding areas, including, but not limited releases, discharges, spills, and leaks from Fire Departments and the Norwood Memorial Airport.

165.    Had Defendants provided adequate warnings, Plaintiff and the Classes could have taken measures to avoid or lessen the exposure to the environment and resources of the Town of Sharon.

166.    Had Defendants provided adequate warnings, fire fighters and other end users of PFAS containing AFFF Products could have taken steps to reduce or prevent the release of toxic PFAS into the environment, surface water, soil, and/or groundwater.

167.    Defendants' PFAS containing AFFF Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

168.    Defendants' PFAS containing AFFF Products marketed, sold, used, and/or disposed of in the Town of Sharon were defective in design and unreasonably dangerous for the reasons set forth above.

169.    Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' PFAS containing AFFF Products in Sharon, including contamination of the Town's drinking water supply with PFAS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

170.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFAS containing AFFF Products.

171.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the contamination of the Town's resources by Defendants' AFFF, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS contamination, as well as operating, maintenance and consulting costs, and legal fees.

## THIRD CAUSE OF ACTION

## PUBLIC AND PRIVATE NUISANCE

172.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

173.    At all times relevant to the present cause of action, Defendants were manufacturers of PFAS Products, such as AFFF containing PFOA and/or PFOS, that was used, discharged or released in a dangerous way, and/or otherwise caused PFAS contamination of the resources of the Town of Sharon, including the Town's drinking water supply.

174.    The Town of Sharon owns and operates a drinking water system which supplies 98% of its residents and businesses.

175.    Defendants owed a duty to Plaintiff to act reasonably and not put inherently dangerous products into the marketplace when harm to natural resources was anticipated.

176.    Defendants knew or should have known that PFOA and/or PFOS from AFFF would be released into the environment during normal use.

177.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has physically invaded, unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public water supply systems and the water sources that supply those systems.

178.    The private nuisance created by Defendants is continuing unabated.

179.    Defendants designed, manufactured, distributed, marketed, and/or sold their PFAS containing AFFF Products in a manner that created, or participated in creating, a nuisance that unreasonably endangers or injures the property, health, safety, and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

180.    Defendants, by their acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFOA and/or PFOS contamination and the perpetual threat of contamination to the town of Sharon resources, including drinking water aquifers.

181.    Actual and threatened PFOA and/or PFOS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of Town Resources in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

182.    Upon information and belief, the improper use, handling, storage, release, discharge, and/or disposal of Defendants' AFFF containing PFOS and/or PFOA has contaminated the environment, surface water, soil, and/or groundwater of the Town of Sharon, including the ground water supply of drinking water wells, which constitutes an ongoing public nuisance.

183.    Plaintiff did not consent to the public nuisance and the Defendants should have known that Plaintiff would not consent to such a public nuisance.

184.    Defendants are jointly and severally responsible to abate the nuisance and ensure that the PFOA and/or PFOS contamination of the Town's water supply does not create a public health risk.

185.    Defendants' actions and omissions unreasonably interfered with, and continues to interfere with, the Town's use and enjoyment of its drinking water sources.

186.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFOA and/or PFOS to be disbursed through the groundwater.

187.    Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their PFAS containing AFFF Products into the environment would and has

continuously, unreasonably, and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Town natural resources.

188.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of Town resources, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination in the Town's drinking water system, as well as operating, maintenance and consulting costs, and legal fees.

## FOURTH CAUSE OF ACTION

### TRESPASS

189.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

190.    Plaintiff is the administrator, owner, operator and/or actual possessor of the public water supply system in the Town of Sharon with the obligation to maintain, operate, and supervise the water systems and the authority to sue relative thereto. Defendants knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS contaminates soil, surface waters, and groundwater, including the drinking water aquifer underlying the Sharon Fire Department and in communication with aquifers underlying the Norwood Memorial Airport.

191.    Defendants failed to properly warn against the use of PFAS Products such that they proximately caused and continue to cause PFOA and/or PFOS to contaminate Town resources, including but not limited to including the drinking water aquifer underlying the Sharon Fire Department and in communication with aquifers underlying the Norwood Memorial Airport.

192.    Plaintiff has not consented to, and does not consent to, this trespass or contamination.

193.    Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

194.    Plaintiff was, is, and will continue to be harmed by the trespass of Defendants' PFAS containing Products into the Town's natural resources.

195.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of the Town's natural resources, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of current PFAS contamination, as well as operating, maintenance and consulting costs, and legal fees.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE

196.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

197.    Defendants knew or should have known that exposure to PFAS are hazardous to the environment and to human health.

198.    Defendants knew or should have known that PFAS were leaching from AFFF used for fire protection, training, and response activities.

199.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate soil, surface water, and/or groundwater supplies if released into the environment.

200.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing, and/or selling AFFF containing PFOA and/or PFOS or their chemical precursors would result in the contamination of the Town's resources.

201.   Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and/or emergency situations military bases, fire training facilities, airports and aviation facilities, and live fire scenarios, in a manner that dangerous chemicals would be released into the environment.

202.   As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of PFAS Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' PFAS Products.

203.   Defendants owed a duty to Plaintiff and the Classes to act reasonably and not place inherently dangerous AFFF into the marketplace when its release into the environment, surface water, soil, and/or groundwater was imminent and certain.

204.   Defendants owed a duty to Plaintiff and the Classes not to contaminate the environment, surface water, soil, and/or groundwater of the Town of Sharon with AFFF containing toxic PFAS.

205.   Upon learning of the release of PFOA and/or PFOS in the Town of Sharon, all Defendants owed a duty to warn and notify Plaintiff of the release of said contamination before it caused injury to Town resources and/or to act reasonably to minimize the damages to the Town.

206.   Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFAS Products; (b) issued instructions on how PFAS Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Town resources; (c) failed to recall and/or warn the users of PFAS Products of

the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of FPFAS Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their PFAS Products.

207.    Defendants breached their duty by allowing PFOA and PFOS to be released in the Town of Sharon and the surrounding areas which overlie the primary sources of drinking water for public and private wells in Sharon through their failure to warn and notify the end users of AFFF of the danger that PFOA and PFOS would enter into the environment, surface water, soil, and/or groundwater.

208.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the PFAS Products.

209.    Defendants' conduct lacked any care and was an extreme departure from what a reasonable careful company would do in the same situation to prevent harm to public health and the environment.

210.    Plaintiff was, is, and will continue to be harmed by Defendants' conduct and omissions.

211.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of Town resources, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of current PFAS contamination, as well as future operating, maintenance and consulting costs, and legal fees.

## SIXTH CAUSE OF ACTION

### ACTUAL FRAUDULENT TRANSFER
### (DuPont and Chemours Co.)

212.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

213.    Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

214.    The Transfers and Assumed Liabilities were made for the benefit of DuPont.

215.    At the time that the Transfers were made and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

216.    The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

217.    Plaintiff has been harmed as a result of the conduct of the Fraudulent Transfer Defendants.

218.    Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## SIXTH CAUSE OF ACTION

### CONSTRUCTIVE FRAUDULENT TRANSFER
### (DuPont and Chemours Co.)

219.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

220.    Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

221.    Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

222.    At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

223.    The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

224.    Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers, or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

225.    At the time that the Transfers were made and Chemours Co. assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

226.    Plaintiff has been harmed as a result of the Transfers.

227.    Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## SEVENTH CAUSE OF ACTION

### PUNITIVE DAMAGES

228.    Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

229.    Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing damage upon Plaintiff, disregarding their protected rights.

230.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably contaminate Plaintiff's water supply wells.

231.    Defendants have caused great harm to Plaintiff, acting with implied malice and an outrageously conscious disregard for Plaintiff's rights and safety, such that the imposition of punitive damages is warranted.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.    Compensatory damages according to proof including, but not limited to:

    a.    costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination of the Town of Sharon resources, including but not limited to equipment to continuously test public drinking water supplies;

    b.    costs and expenses related to the past, present, and future treatment, and remediation of PFAS contamination of the Town of Sharon resources, including the purchase, installation, and maintenance of PFAS treatment equipment for the Town of Sharon water systems.

    c.    costs and expenses associated with and related to the removal and disposal of the contamination;

    d.    costs, including expert witness fees and reasonable attorney fees attributable to producing that portion of evidence that directly relates to the claims of contamination or pollution that impacts or threatens to impact usable ground water; and

    e.    costs and expenses related to the past, present, and future installation, and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within the Town of Sharon;

2.    Punitive Damages in an amount sufficient to deter similar wrongful conduct in the future;

3. Consequential damages;

4.  Costs, disbursements, and attorneys' fees of this lawsuit as provided by law;

5. Pre-judgment and post-judgment interest as provided by law;

6. An order barring the transfer of DuPont's liabilities for the claims brought in this Complaint; and

7. Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated: October 6, 2022.

**Respectfully submitted,**

*s/ Merritt E. Cunningham*
Michael G. Stag (LA Bar 23314)
Merritt Cunningham (LA Bar 32843)
STAG LIUZZA, LLC
365 Canal St., Ste. 2850
New Orleans, LA 70130
Phone: (504) 593-9600
Fax: (504) 593-9601
mstag@stagliuzza.com
mcunningham@stagliuzza.com

*Attorneys for Plaintiff*